WESTERN AND SOUTHERN LIFE INSURANCE COMPANY
v. ROSS, ADMINISTRATOR.

[No. 13,961. Filed April 25, 1930. Rehearing denied July 1, 1930.]

· Josiah G. Allen, Elmer E. Hastings, Arthur W. Allen, John S. Hastings and Carl M. Gray, for appellant.
William D. Curll and Flavian A. Seal, for appellee.

ENLOE, J.—This was an action upon an industrial policy of life insurance in the sum of $500 issued by appellant upon the life of one Ruby Meade, daughter of appellee, Ross. The policy was delivered September 5, 1927, and the insured died of pulmonary tuberculosis March 5, 1928. Upon proof of death being made, appellant denied liability and tendered to appellee all premiums received. The tender was refused, and later, after this suit was brought, said money was paid into court.

The complaint, which was in the usual form, with a copy of said policy attached thereto as an exhibit, was met by an answer in two paragraphs, the first being a general denial. The second paragraph of answer, which was double, sought to avoid liability upon the grounds: (1) Of fraud in procuring said policy of insurance, and (2) upon the ground that said policy contained therein a clause providing "that no obligation was assumed by the company unless upon the date of delivery thereof the insured was in sound health." It was then alleged that, at the time of the delivery of said policy, said insured

was not in sound health, but was then and there afflicted with pulmonary tuberculosis. As to the alleged fraud in procuring said policy, this defense was based upon alleged untruthful answers given by the deceased in her written application for insurance, the said answers being to the effect that the applicant was then in good health, had had no sickness, and had consulted no physician.

The second paragraph of answer was met by a reply in denial, and also two affirmative paragraphs. In the first of said affirmative paragraphs, it was alleged that said application for insurance was filled out by an agent of appellant company who solicited said insurance; that the only question which said agent then and there asked the insured was: "Are you at this time under the care of a doctor?" and to which question said insured answered: "No"; that said agent then and there stated to the insured that this was all the information which the company required concerning her health, as she already had a policy which she had been carrying with the company for a long time; that the insured truthfully answered all questions asked her by said agent, and did not conceal from said agent any fact or facts known to her concerning her then or past physical condition; that said insured supposed that said agent was truthfully writing the answer given to him by the insured; that said application, after the same had been filled out by said agent, was not read to insured, nor did she read the same, but signed said application at request of said agent after he had so filled out the same. The third paragraph alleged that appellant, by and through its agents, with full knowledge of all the facts as to the condition of health of the said insured, demanded and received the premiums on said policy, as such premiums severally became due, up to the time of the insured's death, whereby the company had waived said condition as to her health, etc.

The cause, being at issue, was submitted to a jury for

trial and resulted in a verdict against appellant for the amount of said policy, plus interest thereon to time of trial.

The only question raised on this appeal relates to the action of the court in denying to appellant a new trial. Under this motion, appellant presents alleged error in giving certain instructions, in refusing to give certain tendered instructions, and the sufficiency of the evidence. We shall first examine instructions given of which complaint is made.

Appellant first complains of instruction No. 1, given by the court on request of appellee. By this instruction, the jury was told that if the insured, in her application for insurance, made false statements as to the condition of her health, and as to medical treatment received, then such false statements so made would be grounds for declaring a rescission of said policy, unless the jury further found that the insurance company, with knowledge that said statements so made were false, had received premiums on said policy, and that knowledge of the agent of said company whose duty it was to collect such premiums and remit the same to the company was knowledge of the company, and that it would be bound thereby.

The above instruction was framed upon the theory of "waiver" of the right to disaffirm said contract, as pleaded in appellee's third paragraph of reply. In *Masonic, etc., Assn.* v. *Beck* (1881), 77 Ind. 203, 40 Am. Rep. 295, the court said: "The logical and necessary deduction from this doctrine is, that a distinct act of affirmance of the contract by a party entitled to avoid it, made with knowledge of the facts, and especially such acts as the demand and receipt of premiums or assessments, would constitute a waiver of the forfeiture or of the right to annul the contract; and so it is held in several of the cases already cited." The doctrine thus announced has been many times ap-

proved by both the courts of appeal of this state, as well as in many foreign jurisdictions, and may now be considered as the well-settled law upon the subject of waiver. Appellant urges that this instruction was erroneous in that it did not tell the jury that the burden of proving the said facts as to "waiver" was upon the appellee. In this instruction, there was no attempt to instruct as to the burden of proof, but in instruction No. 6, given of the court's own motion, the jury was told as to the issue raised by appellee's second paragraph of reply; in instruction No. 7, given of the court's own motion, the jury was told as to the issue raised by appellee's third paragraph of reply, and, by its instruction No. 8, the jury was told that the burden was upon the appellee to establish, by a fair preponderance of the evidence, all the material allegations of "both" the said second and third paragraphs of reply.

The appellant also complains of the action of the court in giving instructions Nos. 3 and 5, of those requested by the appellee. After a careful reading of said instructions, we conclude that they are accurate statements of the law, as applied to the issues involved herein.

Appellant next complains of the action of the court in refusing to give its tendered instructions Nos. 1, 2, 3, 4 and 7. In this action there was no error. The said instructions were each mandatory and each entirely omitted the issues tendered by the appellee's said second and third paragraphs of reply. Under these said instructions, the jury would have been required to entirely ignore said issues, whether the same had been established by the evidence or not. In effect, if these instructions had been given, it would have been to withdraw said issues so tendered from the consideration of the jury. Appellant's tendered instruction No. 9, while not mandatory, is incomplete, in that it entirely omits the elements of waiver, and the court did not,

therefore, err in refusing to give it. Appellant's tendered instruction No. 11, was also refused, and of this appellant complains. This instruction was mandatory and, as such, subject to the same criticism as Nos. 1, 2, 3, 4 and 7 above noticed. As to appellant's instruction No. 13, this instruction was covered, as to its material part, by instruction No. 5, given at the request of the appellant.

The appellant next insists that the verdict of the jury is not sustained by sufficient evidence, and that it is, therefore, contrary to law.

The evidence discloses, without conflict, that the insured, Ruby Meade, was, at the time the application was made for the policy herein involved, already carrying a policy in the sum of $500 in appellant company; that she was, and for some time had been, living in Indianapolis and working steadily in a restaurant; that one Walker was the local agent of appellant at Washington, Indiana, where her parents lived; that, about August 1, 1927, the insured went to Washington, Indiana, for a visit to her parents; sometime before she went home, her father, appellee herein, had talked to the agent, Walker, about taking out additional insurance on Ruby and also a policy on another daughter, and that Walker produced an application, interrogated the father as to the condition of Ruby's health, and he, Walker, filled out the same; this was about a week before Ruby came home; and that he turned the application over to Mr. Dillin, an assistant superintendent. Walker also testified that, when he saw Ruby at the time she signed the application, she looked like she was in normal health, and that he thought she was in normal health.

The father testified that, when Walker filled out the application, he was not asked any question as to the condition of Ruby's health; that, when Ruby came home, Walker came to the house and said to Ruby, "Your father took out five hundred dollars more insurance on

you, look at it," and that, in reply to this remark, Ruby said, "Yes," and reached over the banister of the porch and signed it; that she did not read the application nor was it read to her; that when Walker spoke to Ruby about the application, the only question he asked her was as to whether or not she was under the care of a doctor, to which Ruby answered, "no."

Lois Ross, a sister-in-law, testified that she was present at the time said application was signed; that Walker showed her where to sign, and that Ruby signed the application and handed the same back to Walker without reading the same; that the only question asked her was as to whether she was then under the care of a doctor and that Ruby said she was not.

The first question which now arises is: Did the insured make false answers to questions contained in said application for insurance? Upon the record before us, while it possibly discloses, as answers to specific questions, matters which were not true, yet, the great preponderance of the evidence is to the effect that such untruth did not fall from the lips of the insured, and that, if any fraud has been perpetrated herein, such must be placed at the door of appellant's agent, and, to permit an insurance company to profit by such conduct, as is herein disclosed, is against sound public policy. *Aetna Life Ins. Co.* v. *Bockting* (1906), 39 Ind. App. 586, 79 N. E. 524.

The next question we have to consider is as to the state of the health of the insured both at the time she signed said application and at the time the said policy was delivered, and we may say, on this point, that there is no contention that there was any change in the condition of the health of the insured between said times.

The appellant bases its contention that the insured was not, at such times, in good health, upon the testimony of three physicians. One of these, Dr. McKitt-

rick, testified that he furnished proof of death to the insurance company, at the request of some agent for the company; that he first saw the deceased January 25, 1928, in the nighttime, at her father's home; that deceased was in bed; that the windows were raised; that deceased was coughing; that she had a temperature; that she had tuberculosis. He further gave it as *his opinion*, based upon the condition in which he found the deceased that night, that she had been affected for *about one year*. He further testified that this was the only occasion on which he saw the deceased.

Dr. Kleindorfer, who treated the deceased for some weeks before her death, testified that he visited the deceased four times before her death. He was then asked this question: "Now, doctor, taking your experience as a practicing physician and surgeon and also your knowledge gained at medical college and your examination and treatment of Ruby Meade during her sickness, you may state to the jury how long, in your opinion, she had tuberculosis?" To which the witness answered: "I think she had it at least one year."

Another witness, Dr. Bird, gave it as his opinion that, on August 17, 1927, the date said application was signed, the insured, Ruby Meade, was not in sound health.

On behalf of the appellee, there was testimony to the effect that, in the summer of 1927, the insured was ill for a short time from ptomaine poisoning, and went to Dr. Bird for treatment of the same; that, thereafter, she returned to her work and continued thereat until she went home in August, 1927. A large number of witnesses testified as to their long acquaintance with her; that they saw her frequently in August and September of 1927; that she appeared in her usual health and spirits, walked some distance from her father's home to the city of Washington—business section—attended shows, etc., and looked to be in good health. There is also testimony

that during this time she did not have a cough, did not have a temperature, and did not have night sweats.

These persons were nonexpert witnesses and the appellant, citing and relying upon the cases of *O'Brien* v. *Brotherhood, etc.* (1914), 183 Mich. 86, 150 N. W. 130; *Scharlach* v. *Pacific Mut. Life Ins. Co.* (1926), 16 Fed. (2d) 245; and *Ewing* v. *Goode* (1897), 78 Fed. 442, contends that, in the face of said medical or expert testimony the insured, in August and September, 1927, was not in sound health, but was afflicted with tuberculosis, and the said testimony of said lay witnesses can have no probative value.

An analysis of the said cases cited shows the following: In the Ewing case, *supra*, the medical men testified as to certain conditions which they found *to be present*, at the time they made examinations of the plaintiff; in the O'Brien case, there was testimony of two physicians who had attended the insured during her last sickness that the insured died of pulmonary tuberculosis, and one of them testified that, as early as April 15, 1911, he "made a culture" which developed germs of tuberculosis, and that, at that time, the insured had tuberculosis; the question at issue was whether the insured was in sound health on April 29, 1911; in the Scharlach case, one of the questions was as to the good health of the insured on the date of the delivery of the policy, May 12, 1923; on April 5, 1923, the insured was examined by a physician, who found that the red-blood cells were low in number, being about half what they should be, and that the insured was suffering from "severe secondary anaemia"; he treated the patient for two or three weeks, and, on May 12, "got signs of definite failing of the heart"; on April 12, insured had consulted other physicians, who made a blood count of the deceased's blood, which count showed, as they testified, that deceased was

"suffering from anaemia to a marked degree"; based upon these facts, these medical men, as such, testified that, on May 12, at the time said policy was delivered, the said insured was not in good health.

It will be noted that in each of the cases upon which appellant relies, the witnesses, medical experts, testified not merely as such by giving an opinion upon a given state of facts, but, as scientific men, especially trained in a branch of science. They each gave their judgment, their conclusion, based upon *facts* within their own personal knowledge. Their several answers were *not based upon any assumed hypothesis.* In the case at bar, the two physicians who testified as to the cause of the death of the insured, that she died of pulmonary tuberculosis, each testified as an expert in medical science, and their testimony as to the disease which caused the death of said insured, was not, under the authorities cited, and other authorities could be added, a matter to be contraverted by the opinion of a lay witness; the cause of the death as thus established was not to be so contraverted. But, when said physicians were called upon to express *their opinion* as to the time of duration of said disease prior to the death of the insured, they were asked to enter into a field, *not of scientific knowledge,* but of speculation. The said physicians recognized this fact when they were being cross-examined, as shown by the following question to Dr. McKittrick: "Now doctor, can you say to this jury with any degree of certainty, the condition of Ruby Meade's health in August 1927? A. No, I can't with certainty"; also, by the following question, on cross-examination, asked Dr. Kleindorfer: Q. "Doctor, I will ask you to state to the jury if, from all your examination and treatment of Ruby Meade and the history you learned of her ailment, you can state with any degree of certainty her condition as to her health in August, 1927? A. I have

no idea as to her health, as I did not know her."

In cases involving the validity of wills, based upon the alleged insanity of the testator, medical experts are quite frequently called upon to testify, to express their opinion, based upon a given state of facts, as to the mental condition of such testator, but we know of no case where it has been held that such an opinion, so given, is conclusive, where it has been held that lay witnesses may not express their opinion on such subject; and, in this case, we hold that, upon this record, the testimony of lay witnesses was competent to be received upon the question as to whether Ruby Meade was in good health at the time said application was signed and at the time said policy was delivered, the question being one of fact for the consideration of the jury. There is ample evidence to sustain a finding that the insured was in sound health at the time said application was made, and at the time said policy was delivered.

The only other question we need to consider is that of waiver. It is settled law in this state, that when an insurance company, by and through its agents, collects the premiums on a policy of insurance, and at the time of collecting such premiums it had knowledge that the insured was not in sound health at the time of delivery of such policy, it thereby waives such condition as to sound health, and cannot thereafter avoid such policy on that ground. *Metropolitan Life Ins. Co.* v. *Willis* (1906), 37 Ind. App. 48, 76 N. E. 560; *Supreme Court of Honor* v. *Sullivan* (1901), 26 Ind. App. 60, 59 N. E. 37. It, therefore, remains to be considered as to whether there is any evidence to support a finding of waiver.

There is testimony to the effect that the collector for appellant called at the home each Monday morning to collect the premiums; that said collector, on such occasions, saw and talked with the insured;

that in November he solicited her to take additional insurance; that he collected at least one premium after he was told that Ruby had tuberculosis and was very sick; that, for a month or so before the death of the insured, and while she was sick, the agent for the company saw her, talked with her, and collected the insurance premiums and knew at the time that she was sick. The testimony is sufficient to support an inference that, at the time such agent collected said premiums, or some of them, he had full knowledge as to the condition of health of said insured. If so, upon the record before us, even if the jury believed that the insured was not in sound health at the times mentioned, it would have been justified in finding that said condition in the policy as to the condition of insured's health had been waived. We find no error.

Affirmed.